No. 25-50409

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

Securities and Exchange Commission;  Albert Black, III

*Plaintiff-Appellees*

v.

Roy W. Hill

*Defendant-Appellant*

———————————

On Appeal from the United States District Court for the
Western District of Texas, Waco Division
Civil Action No. 6:23-CV-321

———————————

# BRIEF OF APPELLEE ALBERT C. BLACK, III

———————————

Dennis L. Roossien
Munsch Hardt Kopf & Harr, PC
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
[Tel.] 214-855-7500
[Fax] 214-855-7584
droossien@munsch.com

*Counsel for Receiver Albert C. Black - Appellee*

No. 25-50409

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

Securities and Exchange Commission;  Albert Black, III

*Plaintiff-Appellees*

v.

Roy W. Hill

*Defendant-Appellant*

———————————

On Appeal from the United States District Court for the
Western District of Texas, Waco Division
Civil Action No. 6:23-CV-321

———————————

## CERTIFICATE OF INTERESTED PERSONS

———————————

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an

interest in the outcome of this case. These representations are made in order that the

judges of this Court may evaluate possible disqualification or recusal:

1. Defendant-Appellant: Roy W. Hill

   Counsel for Defendant-Appellant Roy W. Hill:
   Richard Lee Fuqua
   Texas Bar No. 07552300
   Fuqua & Associates, PC
   8558 Katy Freeway, Suite 119
   Houston, Texas 77024
   [Tel.] 713-960-0277
   [Fax] 713-960-1064
   Rlfuqua@fuqualegal.com

2. Plaintiff-Appellee: Securities and Exchange Commission

   Counsel for Plaintiff-Appellee Securities and Exchange Commission:
   Jason J. Rose
   Texas Bar No. 24007946
   Direct phone: (817) 978-1408
   rosej@sec.gov
   United States Securities and Exchange Commission
   Burnett Plaza, Suite 1900
   801 Cherry Street, Unit 18
   Fort Worth, Texas 76102

3. Receiver-Appellees: Albert C. Black III

   Counsel for Receiver-Appellees: Albert C. Black III:
   Dennis L. Roossien, Jr.
   Texas Bar No. 00784873
   Munsch Hardt Kopf & Harr, P.C.
   5090 N. Akard Street, Suite 4000
   Dallas, Texas 75201-6659
   Telephone: 214-855-7535
   droossien@munsch.com

Respectfully submitted,

*/s/  Dennis Roossien*

Dennis L. Roossien
Munsch Hardt Kopf & Harr, PC
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
[Tel.] 214-855-7500
[Fax] 214-855-7584
droossien@munsch.com

*Counsel for Receiver Albert C. Black - Appellee*

## STATEMENT REGARGING ORAL ARGUMENT

Appellee Receiver Albert C. Black, III does not believe oral argument would be helpful.

This appeal concerns an order (a) approving and confirming a receiver's recommendation that, in his business judgment, certain steps should not be taken in regard to marketing technology and related equipment that was the basis of a Ponzi scheme, and (b) approving and setting procedures for an interim distribution of cash to the victims of a Ponzi scheme in partial restitution for their losses.

These determinations were made in the course of administering an equity receivership, and are therefore entrusted to the broad discretion of the District Court.

This appeal can be resolved under settled principles of law.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Parties …………………………………...………………i

Statement Regarding Oral Argument……………………………………………...…iv

Statement of Issues Presented ……………………………………………...……...1

Statement of Case………………………………………………………...……...2

Summary of Argument……………………………………………………...……14

Argument and Authorities………………………………………………...……17

    A. The Standard of Review Is An Abuse of Discretion Standard ………17

    B. The District Court's Findings and Instructions Should be Affirmed ...18

    I.    There Is Evidence to Support the Finding that the Receiver Correctly Assessed the CETA Technology………………………….….…18

    II.    The District Court Did Not Abuse its Discretion……………….….…27

    III.    The Court's Order Does Not Violate 28 U.S.C. §§ 2001, 2002 and 2004……………………………………………………………33

Conclusion……………………………………………………………………35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CCWB Asset Invs., LLC v. Milligan*,
  112 F.4th 171 (4th Cir. 2024).............................................................. 18

*Coleman v. Schwarzeneggar*,
  No. C01-1351 TEH, 2008 WL 4160520 (N.D. Cal. Sept. 5, 2008) ................ 24

*In re Couture Hotel Corp.*,
  536 B.R. 712 (N.D. Tex. 2015).......................................................... 24

*Northern Fin. Corp. v. Byrnes*,
  5 F.2d 11 (8th Cir. 1925)............................................................ 17, 27

*Remington Inv., Inc. v. Quintero & Martinez Co., Inc.*,
  961 F. Supp. 344 (D. Puerto Rico 1997)............................................ 24

*SEC v. Basic Energy & Affiliated Res., Inc.*,
  273 F.3d 657 (6th Cir. 2001)...................................................*passim*

*SEC v. Forex Asset Mgt., LLC*,
  242 F.3d 325 (5th Cir. 2001)...................................................... 17, 18

*SEC v. Sharp Capital, Inc.*,
  315 F.3d 541 (5th Cir. 2003)...................................................... 26, 27

*Stadtmauer v. Small*,
  No. 24-1973-CV, 2025 WL 1872759 (2nd Cir. July 8, 2025)........................ 18

*W.F. Potts Son & Co. v Cochrane*,
  59 F.2d 375 (5th Cir. 1932)............................................................ 24

**Statutes**

28 U.S.C. § 2001 ......................................................................... 34, 35

28 U.S.C. §§ 2001, 2002 .........................................................*passim*

28 U.S.C. §§ 2001, 2002 and 2004 ................................................ 33, 35

28 U.S.C. § 2001(a) and § 2002 ................................................................ 34

28 U.S.C. § 2001(b) ................................................................................. 34

28 U.S.C. § 2004 ............................................................................... 34, 35

## Other Authorities

Federal Rule of Civil Procedure 26(a)(2) .................................................. 26

Federal Rule of Evidence 702, 703 .......................................................... 26

Rule 26(a)(1) ............................................................................................ 26

## STATEMENT OF ISSUES PRESENTED

1.      Whether the record contains evidence to support the Order on the Receiver's Motion for Instructions and the Order denying reconsideration.

2.      Whether the District Court abused its discretion in entering the Order on the Receiver's Motion for Instructions and the Order denying reconsideration.

3.      Whether the District Court took any action contrary to the provisions of 28 U.S.C. §§ 2001, 2002, or 2004 (governing receiver's sales) when entering the Order on the Receiver's Motion for Instructions and the Order denying reconsideration.

## STATEMENT OF THE CASE

This appeal arises from an order (ROA 1603-04) (the "Order") issued in response to a motion for instructions (ROA 987-998) filed by a receiver appointed in an equity receivership proceeding initiated at the request of the Securities and Exchange Commission ("SEC") (ROA 50-78, 311-329) in an enforcement action against, among others, Clean Energy Technology Association, Inc. ("CETA") and its founder Roy Hill ("Hill") (ROA 15-29).

The Order makes two findings, first that the "Receiver has correctly assessed the CETA technology", and second that the Receiver "has proposed an equitable plan" (ROA 1603).

Based upon these findings, the District Court instructed the Receiver generally to liquidate the CETA equipment pursuant to the authority granted in the appointment order, permitted the Receiver to compromise vendor claims, permitted the Receiver to abandon the CETA technology, and directed an interim distribution following a number of steps (ROA 1603-04). Those steps included conducting a claims process and a subsequent distribution of "two thirds of the aggregate value of the *then available* CETA cash and/or securities" to approved claimants pro rata based upon their net cash losses (ROA 1603).

The Order was issued in response to the Receiver's motion for instructions, in which the Receiver requested direction as to "whether to liquidate CETA

equipment and effect an interim distribution" (ROA 987). The Receiver explained that, after careful consideration and expert consultation, his considered opinion was that the CETA technology did not have commercial value, and so the Receiver recommended that (a) the CETA equipment should be liquidated, (b) the patents should be abandoned, and (c) the working capital of the company should be returned to investors (*id.*). The Receiver advised the District Court that Hill disagreed because he believed the technology to be commercially viable and so he asserted the equipment and working capital should be employed to attempt to achieve commercial viability (*id.*).

The motion for instructions sets out ten pages of facts bearing upon the decision (ROA 988-997).

First, the Receiver considered the fact that the CETA technology was not used commercially to generate revenues, but instead Hill resorted to using the CETA technology for a Ponzi scheme (ROA 988).

The record contains ample evidence of the Ponzi scheme. The SEC originally submitted three declarations and supporting documents in an appendix (ROA 79-241), which established the facts set out in its motion seeking the appointment of a receiver (ROA 50-55) and supporting memorandum (ROA 56-78). Among the many facts detailed in these papers are (a) an analysis of the bank records that shows CETA and Hill did not generated revenues from business operations (ROA 214) but

instead only raised investor funds, such that returns to earlier investor were being paid with later investor money; (b) documents showing CETA and Hill made false promises the returns would be paid by revenues (e.g., ROA 109-110), (c) false quarterly reports that Hill created and CETA sent out that represented the returns were the result of production revenues (ROA 199), and (d) transcripts of webinars where a promoter falsely represented "our revenue stream is actually oil revenue from added production" and that investments should be made because "we've been doing this three years and we haven't had anything close to missing one of those payments" and because "we have the ability to withstand a 20% decrease in revenue and still manage to pay that" (ROA 221).  Based upon the record submitted, the District Court entered a temporary injunction (ROA 295-310) and appointed a receiver (ROA 311-329).  Hill did not contest these determinations (ROA 390-393). The Receiver himself later found and reported the supposed CETA carbon capture units did not exist, the industrial sites in Streetman and Fairfield were not generating commercial revenues, and the only CETA cash flows were contributions and distributions of investor funds (ROA 431-432).  In working through investor claims, the Receiver also determined that, while the CETA projects that were the focus of the SEC's Complaint were the ones based upon the supposed carbon capture units (ROA 1506), there were also projects based upon "coal distillation" (ROA 1514). Like the carbon capture unit projects, the projects based upon the coal distillation

units "promised preferred returns" arising from supposed operations of the coal distillation units, even though there were no such commercial operations (ROA 1519). The Receiver, therefore, included all of the projects promoted during the 2015 to 2023 timeframe as being a part of the Ponzi scheme (ROA 1521-23) and the Receiver recommended that "while, as discussed below, the SEC's Complaint essentially targets the Shelly phase of the scheme, the Receiver recommends that all of claims arising from 2015 forward be grouped into a single pro rata distribution because they arose in the course of a continuous Ponzi scheme" (ROA 1523).

Second, the Receiver considered the work of the expert he retained to examine the CETA technology (ROA 989-96).

The record contains ample evidence of this work as well. The record reflects the Receiver retained Byron Veech to examine the CETA technology with the approval of the Court and without opposition from Mr. Hill (ROA 989, citing ROA 593-611 and ROA 7 (Sept. 28, 2023 text entry granting motion)). As support for the motion to approve the retention, the Receiver tendered Mr. Veech's CV (ROA 597-600 (Dkt. 48 in the Clerk's record)). The CV sets out ample credentials, including Mr. Veech's degree in chemistry and his decades of service in the coal-fired power industry, including assessing and liquidating equipment in the course of decommissioning coal-fired power plants (*id.*). Mr. Veech's work in this matter and his resulting opinions were first reported in the Receiver's Quarterly Report for

the Fourth Quarter of 2023 (ROA 869-893 (Dkt. 66 in the Clerk's record)).  This

report was made pursuant to the directive in the Order Appointing Receiver that the

Receiver prepare and file quarterly reports that include receivership property

descriptions, valuations, and proposed dispositions (ROA 326-327).     The

statements in the quarterly report are also attested by a declaration from Mr. Veech,

in which he testified as to his retention and qualifications, affirmed his findings and

conclusions as set forth in the quarterly report, affirmed the statements attributed to

him in the motion for instructions, opined that a parallel report of the Department

of Energy  ("DOE") was correct, opined that the equipment at CETA that he

observed was still in a prototype stage, and opined there was a lack of a credible

basis upon which to make a case for commercial viability (ROA 1174-75).  The

findings and conclusions set out in the quarterly report begin with a restatement of

Mr. Veech's qualifications, including his education and experience in the coal

industry, as well as his experience in working on a DOE refined coal project (ROA

870).  The quarterly report further states Mr. Veech conducted a substantial review

and analysis of the CETA records and physical equipment, as well as interviews of

witnesses (ROA 870-71).  The quarterly report explains Mr. Veech's charge was to

examine all of the assets Mr. Hill listed in his sworn inventory of CETA assets and

equipment, which include the two CETA plants, the 6 patents, the products of the

CETA processes, and various equipment (ROA 870, 887-891).  Based upon his

work, Mr. Veech compiled an overview of how the CETA technology and related equipment came to exist (ROA 871-72). Mr. Veech explained CETA first employed pyrolysis to create char and a derivative liquid (*id.*). Mr. Veech explained there is nothing new about pyrolysis (ROA 871). It is simply the process of making charcoal (*id.*). He pointed out the ancient Egyptians were acquainted with the fact a liquid by-product can also be created (*id.*). He recounted that CETA created demonstration equipment that merely employed "known technology to create an expected result" (ROA 872). In addition to coal distillation units, CETA also purported to create carbon capture units to employ the liquid byproduct to refine gas streams flowing from oil and gas wells (ROA 872-873). He noted the latter were not actually fully manufactured (ROA 873). He found none of the equipment reached commercial operation despite extensive attempts to excite interest (ROA 872-73). Mr. Veech found the physical evidence indicated the equipment was rarely used (ROA 873). Mr. Veech identified a number of additional factors he considered (ROA 874-75). Mr. Veech concluded the CETA technology was not commercially viable (ROA 876).

Based upon the evidence developed in the case to date, and the further findings and opinions of Mr. Veech, the Receiver recommended in his report that the appropriate course of action was to restore to the investors of a large majority of the CETA cash and the liquidation of the CETA equipment (ROA 876).

After the quarterly report was submitted, the Receiver filed his motion for instructions, which again detailed the facts upon which his assessment of the CETA technology was based (ROA 987-98).

Hill filed an objection to the motion, in which he asserted the patents should be maintained and the equipment should be marketed specifically to two individuals, Douglas Matheney and Rusty Bell (ROA 1030-43). Hill asserted, among other things, that "the individuals that have filed affidavits want the opportunity to evaluate the equipment to make the determination of what the technology is worth themselves" (ROA 1031).

Mr. Matheney's letter indicates he is an "energy consultant" (ROA 1042). His letter cites to his experience serving with the DOE where he says he was introduced to CETA and that the DOE concluded "the equipment works and produces what Mr. Hill said it would" (*id.*). His April 2024 letter says he had been trying to bring potential buyers to see the CETA operation since May or June of 2023, although there is no indication he contacted the Receiver (*id.*).

Mr. Bell's letter indicates he is the Director of the Office of Economic Transformation at the Gillette College Foundation (ROA 1038). His letter states he is interested in the "equipment/licensing being owned or operated by CETA" and wants to see it within ten days "in actual operation" (*id.*). He indicates he has been

8

trying since May 2023 to come and do his due diligence, but there is no indication he contacted the Receiver (*id.*).

The Receiver made four points in reply (ROA 1109-13). First, he observed that neither of the two individuals were themselves prospective buyers, but instead Mr. Matheney was an energy consultant and Mr. Bell was an employee of a foundation (ROA 1110-11), and that Hill had already had the benefit of twelve years and tens of millions of dollars with which to drum up support among foundations, industry leaders, and others (ROA 1101). Second, the Receiver pointed out that a liquidation effort would be open to any buyer (ROA 1111). Third, the Receiver noted Hill's opposition did not provide any reason why CETA would have to retain all of the cash it had wrongfully taken from investors (ROA 1111-12). Fourth, the Receiver noted Mr. Veech had said that the real problem was not that the equipment did not work, but rather that the CETA technology was not commercial viable (ROA 1112).

While the motion was pending, Hill asked for "a hearing" and for "consideration" of two further declarations from Mr. Matheney and Mr. Bell (ROA 1148-49). Mr. Matheney's declaration asserts there was interest from two investors and five coal mines, but that "the Fairfield plant needs to be fired up and operational" (ROA 1142). Attached to his declaration is a proposal for firing up the plant at the expense of certain unnamed investors (ROA 1152-57). However, the

proposal stipulates that the Receiver must first withdraw the current motion for instructions (ROA 1157). Attached to his declaration is also an email from the Receiver's counsel, which responds to the proposal to fire up the plant (ROA 1159). The response notes Mr. Matheney disclosed he "has already spent a good amount of time promoting CETA with nothing to show for it", starting in 2017 and continuing over the subsequent three years, during which "Mr. Matheney set up a meeting for Hill with various officials, and had some officials visit the CETA facilities" but "it went nowhere" (*id.*). The response questions the benefit of firing up the plant, given that "the plan to fire things back up makes little sense when we consider that the equipment was in a demonstration state for years" (*id.*). The response declines to delay the Court's consideration of this matter and requests that this condition be removed from the proposal (*id.*). (There is no indication this condition was ever removed.) Rusty Bell's declaration provides another copy of his letter, states that the lawsuit is what prevented him from observing the equipment, and says that the purpose of an operating demonstration would be to give certain companies and perhaps others the opportunity "to evaluate the equipment and its value" (*id.*).

In response to Hill's request for a hearing, the Receiver asserted, among other things, that whatever hearing the District Court held need not be an evidentiary hearing because the facts were not disputed (ROA 1166-67) and Hill had not shown

that he would submit any evidence at such a hearing beyond the testimony of the two individuals he had identified that was already before the District Court in the form of declarations (ROA 1168-69). The Receiver's response also provided the Receiver's evidence in the form of a declaration from Mr. Veech summarizing his testimony and affirming the statements attributed to him in the Receiver's quarterly report and motion for instructions (ROA 1174-75), a declaration from the Receiver himself, proving up certain CETA records and the statements in his quarterly reports (ROA 1176), and the CETA records (ROA 1177-1248). The Receiver noted the CETA records put Mr. Matheney's proposal to fire up the plant in the proper context of the earlier efforts he had made to arouse interest in the CETA technology, which included a live demonstration to the DOE in 2017 that resulted in a draft report from the DOE that, like Mr. Veech, identified a lack of data supporting the economic viability of the equipment (ROA 1169, citing ROA 1175). The CETA records— proved up by the Receiver—showed Mr. Matheney was involved in failed efforts to persuade the DOE to validate the CETA technology (*id.*). The DOE report was made after attending a demonstration of the CETA equipment in 2017, and it identified a lack of support for the economic viability of the equipment:

> A more rigorous, completed economic evaluation of the process including capital costs, completed valuation of product streams, market analysis, and operating costs at a commercial, full scale application is recommended prior to scale-up.

(ROA 1190). While this was politely phrased, the DOE's conclusion was a devastating blow according to CETA's own internal memorandum, which states that the DOE report, if publicly released, would be "devastating to our current efforts" because:

> the author is clearly stating that we are still in the early phases of developing this technology and don't have the engineering and marketing analysis needed for commercialization; of course we have heard this assessment from other groups reviewing our technology

(ROA 1205). Mr. Veech's declaration states that nothing had changed since 2017 in that regard (ROA 1175).

The District Court determined it would not hold an evidentiary hearing, but would hold a hearing for the purposes of argument (ROA 1497).

In advance of the hearing, Hill submitted supplemental briefing (ROA 1559-62) to which the Receiver responded (ROA 1563-1569). In his supplemental briefing, Hill does not identify any factual disputes (ROA 1559-62). In his response, the Receiver further explains that there is no conflict in the evidence because only the DOE report and Mr. Veech spoke to the question of the lack of economic viability, and both conclude there is none, such that the issue is not whether the prototype distillation units would, if demonstrated, produce the denser coal and a byproduct fluid, but rather the problem is there is no commercial value to the CETA coal distillation process (ROA 1565-66). The Receiver noted "Hill

provides no competing analysis, expert, or compilation of CETA documents to demonstrate economic viability" (ROA 1566).

On February 28, 2025, the District Court held the hearing (ROA 12 (Docket Sheet, Minute Entry Feb. 28, 2025)).

On March 7, 2025, the District Court entered the Order as detailed above (ROA 1603-04).

On April 3, 2025, Hill moved for reconsideration (ROA 1647-1659). The motion does not identify any new or additional evidence that Hill might have submitted (*id.*). The Receiver responded (ROA 1660-69) and Hill replied (ROA 1670-75).

On April 23, 2025, the District Court denied the motion for reconsideration (ROA 1676).

On April 30, 2025, the Receiver filed his Quarterly Report for the First Quarter of 2025, in which he indicated his intention to implement the claims procedures and, in due course, to effect a distribution of two-thirds of the then available CETA cash (ROA 1677-81). The report states the CETA portion of the cash at that point in time was $65,109,396.53 and an exhibit to the report provides a calculation (ROA 1682, 1687).

On May 21, 2025, Hill filed a notice of appeal (ROA 1772-74).

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion by making findings that the Receiver's assessment was correct in regard to whether the CETA technology was commercially viable, and by providing instructions that the equipment should be liquidated, the patents abandoned, and the cash distributed as restitution, rather than utilizing the equipment, the patents, and the cash in order to attempt to achieve commercial viability of the CETA technology and equipment. The record shows Hill failed to achieve commercial viability during the period 2009 to 2023. He instead chose to use the CETA technology story to operate a Ponzi scheme. After the Receiver was appointed in May 2023, Hill urged the Receiver to use approximately $66 million in proceeds of the Ponzi scheme to pursue commercial viability of the CETA technology. This caused the Receiver to obtain court approval to employ an independent expert to advise him. The advice was that the CETA technology was not commercially viable. The Receiver therefore sought instructions to proceed in line with the expert's advice. In response, Hill urged that the Receiver at least fire up the equipment one more time in order to provide a demonstration, and that the Receiver withdraw the request for instructions in the meantime. Hill submitted declarations from two people who said they knew of people who would like to see such a demonstration. But, it developed that one of those people, Douglas Matheney, had already been involved in promoting the

14

CETA technology in a failed attempt to persuade the DOE of the commercial promise of the technology, and the other person, Rusty Bell, was a relative newcomer brought in by Mr. Matheney just before the Ponzi scheme was interrupted by the SEC.  In regard to whether firing up the plant one more time was a reasonable further step to take, the record shows Hill had years to demonstrate his prototypes, and it contains expert opinions from both the DOE and the Receiver's expert that the CETA technology is not commercially viable, such that even if it was again demonstrated, the obstacle of a lack of a foundation for commercial viability would remain.  The District Court therefore did not abuse its discretion in concurring with the Receiver's own assessment and business judgment, and directing that the subject receivership assets be employed instead to provide restitution to investors for their net cash losses without further delay.

Hill wrongly asserts in his first point on appeal that the record lacks evidence to support the District Court's findings and instructions because the record contains multiple declarations establishing the use of the CETA technology to operate a Ponzi scheme, a declaration from the Receiver's expert in regard to the lack of commercial viability, the Receiver's quarterly reports, a declaration from the Receiver proving up his reports, and CETA records concerning the DOE's report and the prior efforts of Mr. Matheney.

Hill's second point on appeal fails because the District Court had discretion to employ summary procedures as permitted in receivership proceedings when Hill presented declarations from Douglas Matheney and Rusty Bell that did not provide a competing analysis in regard to the lack of commercial viability, and, in sum, merely urged that the Receiver continue Hill's efforts to promote the CETA technology by demonstrating his prototypes as he had done for years before. Considering the entire record, the District Court's findings and instructions fell within the District Court's broad discretion to manage an equity receivership.

Hill's final point on appeal fails because the subject orders did not contravene the statutory requirements for receiver's sales. It appears Hill has overlooked the relevant provisions of the order, and, regardless, Hill identifies no contradictions between the District Court's orders and the statutes.

## ARGUMENT AND AUTHORITIES

### A. <u>The Standard of Review Is an Abuse of Discretion Standard</u>

This appeal arises from the District Court's resolution of a motion for instructions filed by the Receiver (ROA 987-998, 1603-04).

A motion for instructions is a procedural device that permits a receiver to obtain direction from the supervising court.  Where there is a doubtful or important matter, it is appropriate for a receiver to seek instructions from the supervising court, and that court has the power to provide instructions. *See Northern Fin. Corp. v. Byrnes*, 5 F.2d 11, 12 (8th Cir. 1925) ("[Receivers] are at liberty, and are in fact encouraged to apply at all times to the court for instructions and advice, and such is their duty in any doubtful or important matter arising in the course of their duties."); *see also* 2 CLARK ON RECEIVERS § 361, at 618-19 (1992) ("Receivers have a very large latitude in the matter of asking advice and seeking protection of the court appointing them with reference to discharge of their duties.  They are at all times entitled to apply to the court for instructions.").

When a district court is acting pursuant to its equitable powers in supervising a receivership, the appropriate standard of review is abuse of discretion.  *SEC v. Forex Asset Mgt., LLC*, 242 F.3d 325, 331 (5th Cir. 2001).

A review of a district court's approval of a receiver's exercise of business judgment is subject to the abuse of discretion standard. *See e.g., Stadtmauer v. Small*, No. 24-1973-CV, 2025 WL 1872759 (2nd Cir. July 8, 2025).

A review of a distribution plan is subject to the abuse of discretion standard. *Forex Asset Mgt.,* 242 F.3d at 331.

A district court that is fashioning relief in an equity receivership has "broad powers and wide discretion." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001).

Indeed, the district court's power to supervise a receivership is extremely broad and appellate scrutiny is narrow. *CCWB Asset Invs., LLC v. Milligan*, 112 F.4th 171, 178 (4th Cir. 2024).

## B. <u>The District Court's Findings and Instructions Should be Affirmed.</u>

Hill raises three points on appeal. The following demonstrates those three points are not well-taken and that the District Court's order should be affirmed.

## I. There Is Evidence to Support the Finding that the Receiver Correctly Assessed the CETA Technology.

The District Court's instructions to the Receiver regarding the equipment and the patents are based upon the finding that the Receiver has correctly assessed the CETA technology (ROA 1603). In the motion for instructions, the Receiver advised the District Court that, after careful consideration and expert consultation, his

considered opinion was that the CETA technology did not have commercial value, and so the Receiver recommended that (a) the CETA equipment should be liquidated, (b) the patents should be abandoned, and (c) the working capital of the company should be returned to investors (ROA 987).

As explained in the motion for instructions, the Receiver's opinion was based upon evidence that (a) the CETA technology was not employed to generate revenues as Hill falsely claimed, but instead was used to run a Ponzi scheme, and (b) the Receiver's retained expert concluded the CETA technology does not have commercial value (ROA 989-96).

In regard to the use of the technology to run a Ponzi scheme, Hill wholly overlooks the evidence in the record that demonstrates that is what Hill did. The above statement of the case identifies the location in the record of, and summarizes the nature of, the SEC's original evidence that established the existence of the Ponzi scheme, which included declarations and supporting documents (ROA 79-241). The record also contains the Receiver's reports in this regard (ROA 431-32, 1506-23), which were affirmed by a declaration from the Receiver (ROA 1176).

In regard to the qualifications, work, and resulting opinion of the Receiver's retained expert, Hill wholly overlooks the Declaration of Byron Veech (ROA 1174-75). In his declaration, Mr. Veech incorporates and reaffirms the Receiver's

19

Quarterly Report for the Fourth Quarter of 2023 (ROA 870-76), which, after stating

Mr. Veech's qualifications, sets out his findings and conclusions:

- o That his charge was to assess and to determine the highest and best use of the items identified by Hill as assets of CETA in his sworn inventory.

- o That he examined the equipment in question.

- o That he interviewed Hill, the fabricator of the equipment, and others.

- o That he compiled an overview of how the equipment was developed from documentary and live sources.

- o That CETA started in 2009 with lab-scale models.

- o That CETA next created larger demonstration equipment.

- o That, by 2012, the equipment was producing demonstration quantities of CoalLite, oils and solvents, and synthetic gas; but, this was an application of known technology to produce an expected result.

- o That, according to Hill, in 2013, he championed an effort to purchase the Big Brown plant and the mine, which, in his view, would have allowed CETA to have a platform for proving the value of the CoalLite product; but, the proposals were not accepted.

- o That, according to Hill, CETA had many discussions in this timeframe with coal suppliers and power generation groups, both domestic and foreign; but, none of these discussions were ultimately fruitful.

- o That, sometime in 2014, Hill turned to presenting the solvent for use in the oil and gas industry, which was branded as CETASolve; but, only small-scale demonstration models of the "Carbon Capture Unit" were ever created, even though Hill and CETA claimed there were supposedly over 150 CCUs installed and operating in the field.

- o That, rather than develop a commercial enterprise, commencing in 2014 and expanding in 2018, various brokers were more successful in raising money from investors.

o That, this funding allowed CETA to develop an additional site in Streetman for the purpose of building ten more of the commercial size versions of the original CoalLite distillation units; but, the ten units at Streetman and five of the eleven units at Batmen were never completed, and the first six commercial units at Batemen were not significantly used.

o That, when the Receiver was appointed in May 2023, there was equipment at the Fairfield and Streetman sites, laboratory equipment in a warehouse, and partially fabricated equipment at PWC; but, none of the equipment was in commercial operation.

o That, that there was very little documentation reflecting operating or test results, and the condition of the equipment indicated relatively little use.

o That he found only 1500 tons of coal, and 500 tons of the CoalLite product, which, in the coal business, is not much.

o That he could not credit Hill's assertion that the equipment operated regularly.

o That the CETA records do not support the view that commercial sales of the products ever occurred – a point Hill did not dispute.

o That the Fairfield plant does not appear capable of processing a large volume of coal, and does not appear to have done so.

o That there was little evidence of the purchase of coal for the operation.

o That there was a limited amount of CETASolve onsite.

o That there are no records of shipping of CETASolve from the site, whereas very large volumes would have been employed if commercial operations had been occurring as claimed by the quarterly statements CETA issued to investors.

o That there was not even an operating demonstration model of the commercial design of the carbon capture unit.

o That the Fairfield and Streetman plants do not bear physical evidence of material operations.

o   That the claims about operations and results in the investment marketing materials are not supported by business records of such purported operations.

o   That there are a few domestic companies exploring coal pyrolysis using somewhat different designs, but most ventures have not been economically successful. (There are also companies in Europe, Asia and India that are seeking to convert biomass and waste materials into synthetic gas. They all work to some degree, but there are economic and emissions issues. CETA's efforts would therefore face competition.)

o   That, although CETA's demonstration coal distillation units do work to a degree, there are issues presented in regard to scale, economics, and a generally unfavorable domestic view of carbon-based combustion.

o   That CETA was never commercially successful in any respect.

o   That coal pyrolysis or distillation process in not new, such that CETA essentially took old technology and claimed that by containing the entire process of distillation and cooling, they could make the entire process more environmentally friendly by reducing the emissions.

o   That the patents CETA holds were directly linked to the more contained system; but, these ideas were never fully tested on any kind of scale that is meaningful.

o   That the four products they produced were basically the same as have always been generated by the coal pyrolysis process.

o   That CETA did find some new applications for the products they produced and some interesting ideas; but, *they were not commercially viable*, and they would face substantial regulatory opposition as well.

o   That much of the equipment was tailored for CETA, such that, *while some equipment can be sold for use elsewhere, most will have to be sold for scrap.*

(ROA 870-76).

Hill also ignores the fact the Receiver's declaration proves up various CETA records and his quarterly reports. The Receiver's declaration states the reports were prepared in the course of his official duties and contained true and correct facts based upon the investigation the District Court tasked him to perform (ROA 1176). The quarterly reports include a report detailing the fact that the equipment was used to further a Ponzi scheme and that the Receiver retained an expert who opined the equipment had no commercial value (ROA 870-76). The record reflects that the District Court directed the receiver to make quarterly reports containing specific information including the nature of the assets, their value, and their appropriate disposition (ROA 326-27).

Hill finally ignores the CETA records, proven up by the Receiver, which showed Mr. Matheney was involved in failed efforts to persuade the DOE to validate CETA. The report, generated by the DOE after the demonstration of the CETA equipment in 2017, identified a lack of support for the economic viability of the equipment (ROA 1190). The records also showed CETA's internal reaction that the DOE report, if released, would be "devastating to our current efforts" because "the author is clearly stating that we are still in the early phases of developing this technology and don't have the engineering and marketing analysis needed for commercialization" and "of course we have heard this assessment from other groups reviewing our technology" (ROA 1205).

23

Obviously, declarations and the documents they authenticate are evidence. Also, even if not proved up by declaration, the Receiver's quarterly reports are evidence. *See W.F. Potts Son & Co. v Cochrane*, 59 F.2d 375, 376-77 (5th Cir. 1932) (treating receiver's report as the only evidence in the record – "there is no evidence in the record *except the report of the receiver . . .*"); *see also, e.g., In re Couture Hotel Corp.*, 536 B.R. 712, 728 (N.D. Tex. 2015) (admitting receiver's report into evidence at confirmation hearing); *Remington Inv., Inc. v. Quintero & Martinez Co., Inc.*, 961 F. Supp. 344, 349, 351-53 (D. Puerto Rico 1997) (receiver's report accepted as summary judgment evidence over objection); *Coleman v. Schwarzeneggar*, No. C01-1351 TEH, 2008 WL 4160520, *2 (N.D. Cal. Sept. 5, 2008) (ordering that a receiver's report would be admissible at trial).

This evidence demonstrates the most fundamental reason why the equipment should be sold for scrap and the patents abandoned is because it has no commercial value. The lack of commercial viability is established by the fact it was not put to commercial use, but instead was employed to run a Ponzi scheme, and by the fact that both an independently retained expert and the DOE concluded there was no case to be made for commercial viability.

Against this, Hill presented two parties who wanted to have the Receiver fire up the plant in order to show that the coal distillation units would produce a denser coal and a byproduct liquid. But this has never been in dispute. What Hill failed to

produce was any competing analysis as to whether the CETA technology is commercially viable. Even the DOE had some interest in seeing the prototype in operation, but its conclusion after seeing that demonstration was that the technology was not commercially viable. The evidence submitted by the Receiver shows that whatever interested parties Rusty Bell or Douglas Matheney may have brought to a demonstration would have concluded the same.

Hill also points to the issuance of patents. But, the existence of a patent does not establish that any patented technology is commercially viable.

Hill cannot reasonably complain about the Receiver's decision to first set forth Byron Veech's credentials, procedures, analysis, and opinions in a quarterly report. Mr. Veech was retained for the purpose of advising the Receiver as to the probable value and the most appropriate course of action to take in disposing of the CETA equipment and intellectual property. It follows that the correct place to present Mr. Veech's findings and conclusions as to the value and proper disposition of the CETA equipment and intellectual property was in the Receiver's quarterly reports. This is because, under the Receivership Appointment Order, one component of the Receiver's quarterly reports is describing the receivership property including "approximate or actual valuations" and "anticipated or proposed dispositions" (Doc. 8 at 16, ¶55(D)). Therefore, Mr. Veech's findings and

conclusions were appropriate provided as a component part of the Receiver's Quarterly Report for the Fourth Quarter of 2023 (Doc. 66 at 2–8).

Hill was not entitled to receive an additional expert report setting forth essentially the same information before the District Court considered Mr. Veech's declaration. In receivership proceedings, it is appropriate for a district court to employ summary procedures. *See SEC v. Sharp Capital, Inc.*, 315 F.3d 541, 545 (5th Cir. 2003); *following SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001). This means the district court need only provide "due process." *Basic Energy*, 273 F.3d at 668. This requires only that the district court permit the parties to submit evidence and to make arguments regarding the facts. *Id.* It thus follows that Federal Rule of Civil Procedure 26(a)(2) had no application. *Cf.* FED. R. CIV. PROC. 26(a)(2) (providing that: "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use *at trial* to present evidence under Federal Rule of Evidence 702, 703, or 705."). Regardless, there was no surprise and no reason why the quarterly report would not suffice in substance as a disclosure of expert testimony.

In sum, there was ample evidence submitted in support of the District Court's finding that the Receiver's assessment was correct and that the proposed plan was equitable, and in support of the instructions that the equipment be sold for scrap, the patents abandoned, and the investor funds be returned without delay.

## II.    The District Court Did Not Abuse Its Discretion

The District Court properly employed summary procedures to make findings and to provide instructions to the Receiver to liquidate receivership assets in a manner consistent with their value as shown by the record and to make an equitable distribution to defrauded investors pro rata based upon their net cash losses of two thirds of the then-available CETA cash.

Again, a motion for instructions is a proper procedural device that permits a receiver to obtain direction from the supervising court. Where there is a doubtful or important matter, it is appropriate for a receiver to seek instructions from the supervising court, and that court has the power to provide instructions. *Northern Fin. Corp. v. Byrnes*, 5 F.2d 11, 12 (8th Cir. 1925) ("[Receivers] are at liberty, and are in fact encouraged to apply at all times to the court for instructions and advice, and such is their duty in any doubtful or important matter arising in the course of their duties."); *see also* 2 CLARK ON RECEIVERS § 361, at 618-19 (1992) ("Receivers have a very large latitude in the matter of asking advice and seeking protection of the court appointing them with reference to discharge of their duties. They are at all times entitled to apply to the court for instructions.").C

As noted above, in receivership proceedings, it is appropriate for a district court to employ summary procedures. *SEC v. Sharp Capital, Inc.*, 315 F.3d 541, 545 (5th Cir. 2003); *following SEC v. Basic Energy & Affiliated Resources, Inc.*,

273 F.3d 657, 668 (6th Cir. 2001). This means the district court need only provide "due process." *Basic Energy*, 273 F.3d at 668. This requires only that the district court permit the parties to submit evidence and to make arguments regarding the facts. *Id.* An evidentiary hearing is not required when the facts are not in dispute. *Id.* at 669.

Further, in order for an appellant to show that the appellant was not provided due process, an appellant must demonstrate how the appellant would have been able to better defend himself in a plenary proceeding. *Basic Energy*, 273 F.3d at 668. This includes showing what evidence the appellant would have submitted at an evidentiary hearing. *Id.* at 669.

The only evidence Hill identifies are the declarations of Douglas Matheney and Rusty Bell, and the existence of the patents themselves. It was not necessary to conduct an evidentiary hearing to hear from these two individuals. The District Court could have accepted their views at face value because they merely show at least two individuals, and perhaps others, were interested in seeing the CETA coal distillation units in operation. Taken in the context of the record as a whole, this means that, in the case of Douglas Matheney, he remained interested in promoting CETA technology, just as he did in the 2017 timeframe, and Rusty Bell was just the latest in a long line of people interested in the concept. But, the results of the prior efforts to demonstrate the equipment were something the District Court could

consider as well. As detailed and explained in the statement of the case, the record demonstrated, in 2017, the DOE saw the prototype coal distillation units in operation and concluded the CETA technology was not commercially viable (ROA 1175, 1176, 1190, 1205). The record further shows nothing had materially changed since then (ROA 1174-75), such that Mr. Veech came away entirely unpersuaded, even though he understood that the equipment did what Hill said it would do (ROA 1174, affirming statements made in ROA 872, e.g. – "By 2012, the equipment was able to produce demonstration quantities of CoalLite, oils and solvents, and synthetic gas."). The problem Mr. Veech identified was that "this was an application of known technology to produce an expected result" (*id.*), not a demonstration of commercial viability (ROA 1174-75, affirming statements at ROA 875). Nor were the DOE and Mr. Veech the only ones to have been unpersuaded by a demonstration. The record shows Hill and his employees at CETA reached out to "utility companies, mines, investment brokers, and individual investors, some of whom inspected the test site and the products produced" and later "CETA had many discussions in this timeframe with coal suppliers and power generation groups, both domestic and foreign, none of which were fruitful" (ROA 1174, affirming statements made in ROA 872).

The District Court, therefore, was not required to conduct an evidentiary hearing in order to accept as true facts that did not undermine the Receiver's

assessment of the technology as being not commercially viable, and to accordingly refrain from directing the Receiver to go to the trouble of firing up the plant for Douglas Matheney, Rusty Bell, or anyone they might bring to see it, as well as to conclude that the equipment should be sold for scrap and the patents abandoned.

Hill's contention that the coal distillation units were not a part of the Ponzi scheme is not correct. The Receiver's declaration proved-up all of his quarterly reports (ROA 1176). The Receiver's Quarterly Report for the Fourth Quarter of 2024 sets out the Receiver's efforts to compile a claims ledger setting forth the claims of all the victims of CETA's fraudulent schemes (ROA 1500-05). The results of that effort demonstrated that while the CETA projects that were the focus of the SEC's Complaint were the carbon capture units (ROA 1506), "[s]tarting in 2015 and continuing until May 2023, CETA promoted projects that were supposed to produce returns to the involved Investors derived from revenues generated through the commercial application of the CETA technology" and "[m]any of those projects pertained to coal distillation" (ROA 1514). Like the carbon capture unit projects, the projects based upon the coal distillation units "promised preferred returns" arising from operations of the coal distillation units, even though there were no actual commercial operations (ROA 1519). The Receiver, therefore, included the projects promoted during the 2015 to 2023 timeframe as being a part of the Ponzi scheme (ROA 1521-23) and the Receiver recommended that "while, as

discussed below, the SEC's Complaint essentially targets the Shelly phase of the scheme, the Receiver recommends that all of claims arising from 2015 forward be grouped into a single pro rata distribution because they arose in the course of a continuous Ponzi scheme" (ROA 1523).

Hill's complaint is unfounded regarding the Receiver's reports, which state the "CETA cash" consists of all of the cash in the receivership estate, except for the Shelly portion of the cash that is specifically broken out on the exhibits to the Receiver's reports (e.g., ROA 1526, 1529, 1531). The report states the total cash in the receivership estate is $66,836,523.93 (ROA 1526), which is the amount also shown on the summary "SFAR" report attached as Exhibit A (ROA 1529). The Shelly exhibit indicates two items are included in SFAR total, and they are $358,841 that was frozen in Shelly's personal checking account and $1,201,778.78 that represent proceeds of the sale of Shelly's residence (ROA 1531). Hill offered no evidence to suggest these figures are not correct. Hill's assertion that the Receiver fails to explain where the "CETA cash" came from is also incorrect. The Receiver explains in the same report that CETA obtained cash by persuading investors to make deposits made to fund CETA projects in the course of a continuous and intertwined Ponzi scheme that involved commingling of funds over the period January 2015 to May 2023, in which investor funds flowed directly or indirectly through broker-controlled accounts into accounts held at Wells Fargo, from which

Ponzi payments were made, since there were no revenues (ROA 1521-23). Given this record, the instruction to the Receiver was clear in regard to first completing the claims process and then distributing "two thirds of the aggregate value of the *then available* CETA cash and/or securities" to approved claimants based upon their net cash losses (ROA 1603). As of April 30, 2025, the Receiver reported specifically that the amount of the CETA cash then available was $65,109,396.53 and a calculation was provided (ROA 1682, 1687).

With regard to the equipment, the Order is clear that the Court found the Receiver had correctly assessed the CETA technology (ROA 1603), which is obviously a reference to the motion for instructions, in which the Receiver advised that after careful consideration and expert consultation, his considered opinion was that the CETA technology did not have commercial value (ROA 987), and the report upon which it was originally based, which contains a list of the equipment in question that is taken from Hill's own inventory (ROA 888-891). Because of his assessment of the lack of commercial value, the Receiver recommended (a) the CETA equipment should be liquidated, (b) the patents should be abandoned, and (c) the working capital of the company should be returned to investors (ROA 987). The reasoning of the District Court is therefore plain.

The District Court did not abuse its discretion. The District Court had discretion to employ summary procedures. The District Court had an ample record

to support its findings. The District Court's directives were within its discretion to approve the business judgments of the Receiver, to dispense with a pointless exercise to fire up the plant yet again, to return to investors the money Hill stole from them in the course of a Ponzi scheme, and to do so without further delay.

## III.  The Court's Order Does Not Violate 28 U.S.C. §§ 2001, 2002 and 2004.

The District Court did not direct the Receiver to ignore the statutory procedures for Receiver's sales. To the contrary, the Court directed the Receiver to follow the terms of the Order Appointing Receiver, which is consistent with the requirements of the applicable statutes.

The Order Appointing Receiver provides the Receiver the following directives in regard to sales of receivership assets:

> 37.    The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.
>
> 38. Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

33

39. Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

(ROA 322-23).

The motion for instructions does not seek relief from these requirements. Rather, the motion for instructions seeks direction on whether to proceed with a general liquidation of the equipment at all (ROA 987, 996), as opposed to using the CETA cash to pursue commercial viability of the equipment as urged by Hill (ROA 987) (identifying the conflict as being that Hill "asserts the technology is commercially viable and so the equipment and working capital should be employed to attempt to achieve commercial viability.").

Likewise, the Order providing instructions does not relieve the Receiver of the statutory requirements, but instead points the Receiver back to the authority defined in the appointment order (ROA 1603, item (1)).

It is true that the appointment order implies a preference for private sales of real estate under 28 U.S.C. § 2001(b), as opposed to public sales under 28 U.S.C. § 2001(a) and § 2002, but these are alternative course of action.

It is also true that the appointment order implies that sales of personalty are not required to be conducted in accordance with 28 U.S.C. § 2001, but 28 U.S.C.

§ 2004 provides a court may require compliance with Section 2001 or may "order otherwise." 28 U.S.C. § 2004.

Hill wrongly charges that the Order provides any direction in regard to "fixtures". To the extent something constitutes real property, paragraph 39 of the appointment order provides clear direction.

Hill also wrongly charges that the appointment order bypasses the statutory requirements, since paragraph 39 of the appointment order obviously does acknowledge those requirements, and, to the extent the order limits them in the case of personalty, the appointment order does nothing more than exercise the District Court's ability under Section 2004 to "order otherwise" in regard to sales of personalty.

In sum, Hill fails to show the District Court ignored the requirements of 28 U.S.C. §§ 2001, 2002 and 2004.

## CONCLUSION

Wherefore, premises considered, the Receiver prays that the District Court's orders of March 7, 2025 and April 23, 2025 be affirmed.

Respectfully submitted,


*/s/  **Dennis Roossien***
_____

Dennis L. Roossien
Munsch Hardt Kopf & Harr, PC
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
[Tel.] 214-855-7500
[Fax] 214-855-7584
droossien@munsch.com

*Counsel for Receiver Albert C. Black - Appellee*

# CERTIFICATE OF SERVICE

I certify that the foregoing Appellee's Brief was electronically filed on the 23rd day October, 2025, using the Court's CM/ECF system which will provide a notice of electronic filing to all counsel of record as of the date of this filing, including the following:

1.  Counsel for Defendant-Appellant Roy W. Hill:
    Richard Fuqua,
    8558 Katy Freeway, Ste 119
    Houston, TX 77024

2.  Counsel for Plaintiff-Appellee Securities and Exchange Commission:
    Jason J Rose
    United States Securities and Exchange Commission
    Burnett Plaza, Suite 1900
    801 Cherry Street, Unit 18
    Fort Worth, Texas 76102

*/s/ Dennis Roossien*
_____
Dennis L. Roossien

*Counsel for Receiver Albert C. Black - Appellee*

4897-0740-4403v.3

# CERTIFICATE OF COMPLIANCE

### With Type-Volume Limitation, Typeface Requirements, and
### Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 8,253 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) (and 5th Cir. R. 32.1) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, version X7, in Times New Roman font 14 point type face, with at least one inch margins.

*/s/  Dennis Roossien*
_____
Dennis L. Roossien

*Counsel for Receiver Albert C. Black - Appellee*